Rahim Delano Fulton v. Christy Noem et al. Good morning. Mayda Rahman for the appellant, Mr. Rahim Fulton. Your Honors, this case is about the government's obligation to provide an individual in its custody with 30 days of medically necessary dialysis treatment upon release from detention. For Mr. Fulton, the difference between getting and not getting this care is life and death. Mr. Fulton is likely to succeed on the merits of his claim of whether jurisdiction holds here for three reasons. First, this case is a core habeas about conditions of confinement seeking release from detention in accordance with the law, in accordance with 30 days of dialysis treatment. What is the source of that obligation? Are you arguing that this is a constitutional matter? After all, it is a life and death situation, that the government is constitutionally obliged to do this? Yes, Your Honor. We are arguing that the government is constitutionally obliged, but we are also arguing the government is obliged under their own standards, the performance-based national detention standards. Do those standards – first of all, I had a hard time even finding these things. I had to go to the ICE website to locate them, because they're not government regulations, right? They're not in the CFR. We disagree that these are not government regulations. Courts across the country have found the PBNDS to be enforceable. Well, they may – other courts may or may not have. We've got to consider this from basic principles. I'm trying to find out what these things are. As I understand it, these are rules adopted by the Department of Homeland Security to bind institutions where they have people in detention, and they're enforced by contract. They're made part of a contract between the Department of Homeland Security and the State detention facilities and private jails and all the hidey holes where detained immigrants are sent. Is that – am I wrong about that? No, Your Honor. The PBNDS are contractual standards, but they're binding upon both the government and any external entities it contracts with. What makes them binding on the Department of Homeland Security? They are – excuse me, Your Honor. They are enforceable under the APA, according to Accardi, because they are – they provide benefits to individuals in their custody. And Accardi has held that it applies with particular force in cases where the rights of individuals are affected, and it is incumbent upon agencies to follow their own procedures. Well, but again, when you say these are their own procedures, is there any place in these standards that says that the Department of Homeland Security is bound by these? Your Honor – The performance-based national detention standards apply to both ICE and the agencies it contracts with. What says that? The standards themselves, Your Honor. Okay. Can you cite me where that is so I can find it when I go back and find the website again? Where will I – where in the standards does it say that? Because you know an interesting thing? One place I looked trying to understand these things was to an immigrants' rights organization's website. Now, this is not authoritative at all, but they said these are not binding on ICE. Now, I mean, they may be – they're more likely to be wrong than right, for all I know. But I thought that was a rather strange thing to find in an advocacy document, and I was puzzled over this question myself. So I'm just trying to find out where in the standards or where external to the standards is there any statement by the department that it is itself bound by this? Because really what these standards say is that the detention facility has to provide a supply of medication. And I've encountered that before in situations – I think it was the Essex County Jail or someplace. And the issue was a more normal pile of pills to be given out, that there had to be a sort of release statement or health plan for people who were being released from detention. But this seems like a rather different thing. You're saying that this governs the Department of Homeland Security in executing a removal order. And I could not find anything that said that that is true. Your Honor, I don't have the site for the binding, but I would be happy to provide that to the court asking. Because for me, understanding structurally where these issues go is important. I understand the question before us to be the likelihood of success on the appeal of the dismissal for lack of jurisdiction. I had understood sort of the questions that – some of the issues that my colleagues – to be a merits question that is not exactly before us. That is to say – and there might be interweaving. But just in terms of placing the argument, am I – do you – as you understand it, is the question before us the likelihood of success as to the appeal of the dismissal for lack of jurisdiction under 1252G? Yes, Your Honor. That's exactly how I understand it. And so how does what the underlying merits question as to the entitlement to the provision of dialysis for 30 days as part of the removal order, how does that interface with that jurisdictional question? Your Honor, the fact that we are seeking medication and we are seeking – the relief we are seeking is solely medication, is critical to the – whether the court has jurisdiction or not. In Delgado v. Quarantio, the court said that we should look to the substance of the relief that plaintiff is seeking to determine whether or not the court has jurisdiction. And here, the substance of the relief that we are seeking is 30 days of medication based upon the performance-based national detention standards, but also upon constitutional claims that Your Honor mentioned earlier. I'd like to turn now to my second point about the legal questions in this case, that even if this Court finds that this action does challenge execution of a removal order, the legal questions in Mr. Fulton's case are still too remote to arise from execution of a removal order. And the Court in Jennings v. Rodriguez set out this test, that when legal questions are too remote from the actions taken, courts retain jurisdiction. And the legal questions here are about detention, are about whether or not Mr. Fulton has access to discharge planning under the Constitution, under the performance-based national detention standards. And those are entirely too remote from the execution of a removal order to bar jurisdiction. And the Jennings Court explicitly found that conditions of confinement claims were too remote to bar jurisdiction, and said that it would be absurd and lead to staggering results just because these claims arise broadly in the context of removal proceedings. Turning now to my third point, I'd like to briefly address that even if the Court finds that 1252G does bar this claim, the suspension clause still applies because Mr. Fulton is only seeking release consistent with the law, and there is no adequate substitute for him to bring these claims. This Court has already held in Ragbeer that an individual must be given access to the writ or an adequate substitute to the writ in order to maintain the delicate balance of governance that is itself the surest safeguard of liberty. And while the judgment in Ragbeer was vacated and remanded by Thurisidgium, the reasoning behind the Ragbeer Court still applies and is still the same. Thurisidgium here only stands for the narrow proposition that an individual who is seeking to enter the country or use habeas as a way to stay in the country cannot do so. Mr. Fulton does not seek to gain entry into the country, or he does not seek an additional opportunity to gain relief because he is not challenging execution of a removal order. And the Supreme Court's recent decision in JGG versus Thurisidgium reaffirmed that Thurisidgium — excuse me, JGG versus Trump — reaffirmed that Thurisidgium was a narrow decision that was not meant to bar all detention-related claims and that lower courts should actually consider challenges to removal at habeas. It didn't say that there is no jurisdiction for this sort of claim. I'd like to return to our constitutional claims. On the remoteness point, do you understand that to be sort of fact-specific or kind of generally how it's characterized in the petition? I don't know. I mean, if dialysis is not available in Jamaica, for example, such that the relief that you're seeking couldn't be effectuated along with removal, at that point, has it turned into an execution of removal order? There are still ways for the government to — for the government to release their obligations under this. So the government can, for example, release Mr. Fulton on an order of supervision and allow him with the opportunity to provide for his own care. And because the PBNDS only governs immigration detention and the Court's decision, for example, in Charles v. Orange County, speaking to this issue of discharge planning, was really conditioned on the reasoning that an individual can't provide for their own care while they're detained. If Mr. Fulton were to be released on an order of supervision for a time that is reasonably necessary for him to procure his own medication, the government would be able to deport him after that amount of time. Is there no possibility today for him to make arrangements for dialysis in Jamaica? I mean, he has lawyers. I don't know if he has relatives or next friends or others who would be in a position to make an appointment for him in Jamaica. But why is he disabled from making arrangements for this? Your Honor, he can certainly try, but we are speaking to the government's obligation here. And as this Court noted in Charles — That's very nice. If my client were going to die, I would think my main goal is to make sure that he gets treatment one way or another. So, yeah, you have a right to be here and make these arguments. I'm just trying to figure out what's going to happen next. After all, I assume dialysis is available in Jamaica because you're not making an argument that he can never be sent there. Because even if they give him 30 days of dialysis somehow, take him to a military base or something in Jamaica or a U.S.-run hospital somewhere in Jamaica and arrange for him to get that treatment for 30 days, there's no other dialysis available in Jamaica. He's just getting a stay of execution. So I assume that you're not arguing that he can't be sent to Jamaica, period, right? We are not arguing that. We are arguing that if he is sent to Jamaica, the government has an obligation to provide him with medication — For 30 days. For 30 days is the standard under the performance-based national detention system. After which he is on his own. Or are you saying the constitutional standard is more stringent than the — The constitutional standard is more flexible, Your Honor. It's the amount of time reasonably necessary for him to consult a doctor and obtain a new supply. So in this context, it would be to be able to set up those appointments for himself. So it could be less or it could be more. But the flexibility there was intended on purpose to provide an individual with continuity of care regardless of how much time that may take. I get it. Okay. Thank you. I see that I'm out of time. Thank you. Yes, you have — Oh, yes. We have your argument. Thank you. Thank you, Your Honor. Good morning, Your Honors. And may it please the Court, Truman Stampad on behalf of the United States. This Court lacks jurisdiction to halt Mr. Fulton's removal for two reasons. First, 8 U.S.C. 1252G is both clear and emphatic. Courts cannot review the decision to execute a removal order. That is exactly what Mr. Fulton is seeking to do here. Well, wait. As I understand what you're saying, you're not merely saying that this stay should be denied because the district court had no jurisdiction and, therefore, the petitioner is unlikely to succeed on the merits. You're saying we do not have the authority to enter a stay? I'm saying both, Your Honor. I understand that. You're not just saying the one. That is correct. You're saying the other. You're saying that this Court lacks any jurisdiction to enter a stay to protect its appellate jurisdiction to figure out the other issue that you're relying on. Yes, Your Honor. And I say that based on the decisions that other circuits have reached in TASU and EFL and Camarena. How is that consistent with Niken? I'm sorry? With the Supreme Court's decision in Niken. So the Supreme Court's decision in Niken was about staying a removal order that was properly before a court of appeals, that a court of appeals had the authority to review. Well, that's the underlying question of the district court's jurisdiction. And I understood you to say to Judge Lynch that you're making a separate argument about our jurisdiction to grant a stay of removal. And there, I think Niken answers, it uses language about inherent authority, but that we have jurisdiction to grant a stay, that there is jurisdiction to grant a stay of removal in order to determine pending an appeal. And if that's true in Niken, I don't see why that wouldn't be true here. So the reason would be, Your Honor, that the removal order was properly before a court of appeals in Niken where the court of appeals had the authority to review the actual substance of the removal order. This Court lacks that jurisdiction in this context under 1252a5 and b9 because the removal order is not before it. And, again, I would point to TASU and Camarena and EFL, all of which go to 1252g, all of which talk had stayed removal or halted removal pending appeal, and then talk about in their decisions about their own jurisdiction as to whether or not they could stay that appeal, stay removal pending that appeal. So suppose the government has an order saying that an individual noncitizen should be removed from the United States. And the government decides we're going to remove him and the way we're going to do it, I'm taking this from a wise district judge's opinion, the way we're going to do it is to drop him on a raft in the middle of the Atlantic Ocean. What would his remedy be? He has no basis to challenge the order of removal per se, or maybe he's already challenged it and lost in the court of appeals. If the government were to do something like that, what would the remedy be? Or would there be none? Is the government's position there would be none because no court has authority to review the execution of a removal order and the manner in which it's being executed? Your Honor, I think in that sort of case, in that sort of scenario, it would be difficult to figure out what the appropriate remedy would be. Well, I mean, okay, it would be difficult. These guys have come up with one. You say that's no good. They're saying this is the equivalent, right? They're saying you're shipping him off to a country with no provision for a life and death procedure that he needs to have twice a week. Now, putting aside whether the regulation about 30 days is binding, it's not 30 days for him. It's something like a week or less within which he would die if he can't arrange for a dialysis. And one imagines that the ideal situation for making doctor's appointment is not being dropped on the tarmac in a foreign country where you haven't lived, maybe, I don't remember the situation, ever or for 30 years or whatever. So they're saying that's this. That hypothetical is this case. So what are we going to do about this? So I would push back on the hypothetical just in this case because I think the facts show something completely different. We have a declaration that says that — Well, why don't we not push back on the hypothetical, and we'll worry about whether the hypothetical is like this case or unlike this case next. Okay. Let's first get to the hypothetical. Would there be no remedy? Is the government's position screw-up? Nothing the courts can do about it. I think in that sort of scenario, it would be difficult to have a remedy just because I think 1252G is a pretty firm — has a pretty firm hold on what can — So no one could stop the government from doing what I just proposed as a possibility? I think there's — there can be a mechanism by which to do that. I think it has to be done in the appropriate course. What would that be, then? That would be a petition for review, Your Honor. I think it would — How could it be a petition for review? The petition for review in the hypothetical has already been denied. It's been had and denied because, after all, the person has no right to be here. So he didn't win on whatever grounds for relief he had with respect to whether he should be removed from the United States. Is there any way to challenge the means by which the government proposes to execute the order? So definitely not in district court to the extent that there can be review. The best way to do that is a petition for review. That's exactly what that — Are there any provisions in a final order that you would concede could be challenged in habeas in district court? Any various provisions? Your Honor, I'm having a letter from — Any provisions in the final order, inclusion of any provisions in the final order that could be challenged in habeas? I think, Your Honor, for someone that is subject to titillate, removal under the INA — Yeah. I would say no. I think that — I think Congress spoke pretty clearly. Help me understand the AADC decision from the Supreme Court, which, you know, has this language about it's not a zipper clause, sub G. And it says there are, of course, many other decisions or actions that may be part of the deportation process. And it says such as things, and I'll read those, that can be brought in habeas, right? It's distinguishing what can and what can't by reading the three clauses in a limited way. And so it says there are many other decisions or actions, and one of them it lists is to include various provisions in the final order that is the product of adjudication. Why isn't that this? I think that's been superseded by the REAL ID Act, Your Honor. So REAL ID Act pretty firmly eliminated habeas jurisdiction in district courts for anything related to removal. For anyone subject to Title VIII, they have to bring that through a petition for review. That is their one — that is their one form of review, and that's what they've done. But how could — how could someone do that at this stage? Because by this point, the petition for review is long since final. I mean, the removal order is long since final, right? I mean, he has no — we would have no jurisdiction to review a — to decide a petition for review, right? So in this context, absolutely. I think we — I think all parties would agree that you wouldn't have jurisdiction over the petition for review of the final order as — That we would not have. That you would not, yes, as it exists today. But what I would add, though, is that he could file a motion to reopen on a different basis and whatnot. That path does available — that remains available to him by which he can then petition this Court for review that way. You'd oppose that, though, right? If he made that — if he went to the BIA and said, I'd like to reopen, the government would oppose that, I assume? I would think so. Without knowing their arguments, I think we would. But that's the adversarial process. And, you know, at that point — Okay, I understand. And let me get back to one other sort of simpler life-and-death matter. What's the big problem with arranging for dialysis in Jamaica? So, Your Honor — There's nobody in the United States government who can call up a hospital in Kingston and arrange for dialysis. Your Honor, may I refer to the declaration that I — Yeah, sure. So I would say those conversations have been had, right? Mr. Fulton has been told that DHS cleared his removal medically. Conversations were had with the Jamaican embassy officials. The Jamaican Ministry of Health cleared the removal. It is my understanding that for a Jamaican national that has a serious health condition, the Ministry of Health in Jamaica has to clear all removals. So it was only after that clearance was removal scheduled and was scheduled to occur. Okay, so what did that clearance consist of? What does that mean? Does that mean — is this a judgment that he really doesn't need dialysis, or is this a judgment that he's going to get it? So I'm quoting from the declaration, Your Honor, is that the declarant, Nathan Gray, said, I have spoken with the security attaché at the embassy in Jamaica on January 21st and confirmed dialysis will be available for Mr. Fulton in Jamaica, and they have informed both Mr. Fulton and his family in Jamaica of his upcoming — Is there a mootness issue, if that's the case? Arguably, potentially, but I think with the way that Petitioner has framed his challenge, I think it goes to this Court's jurisdiction under 1252G. So if the Court is thinking about its inherent authority on whether it can stay removal in this context — Well, mootness would be jurisdictional, too. Understood, Your Honor. So it's possible, but I will note that this declaration was before the district court and it didn't — and it wasn't decided on mootness. We have our own obligations. Yes, Your Honor. And if I think — if you think that this is a mootness issue, then the appeal — I mean, isn't that the relief being sought? I hadn't trained on this, so I'm just trying to make sense of the relevance of that. I mean, other than it matters, obviously, for this human being, for purposes of the relief being sought, is that different, what's provided there, than the relief being sought? So, Your Honor, I understand Petitioner to be requesting a different kind of relief. So I think that addresses whether or not this is moot. They want DHS to do more than what has been provided in the declaration. So for those purposes, I think there is a live case in — there remains a live case in controversy. Maybe we should ask them what it is that's more than that that they're asking for, since that's not your obligation. I mean, you could argue it's mootness. I understood, Your Honors. I take the point. But I think their papers make clear that they want something else. And I think it's important to note how they frame their challenge, which is they want 30 days of medication. In their opening papers, they talk about the 30 days of medication really mean scheduling dialysis three times a week and doing all that. And by their reply, they're focusing on the 30 days of medication. Are they now only focused on medication? Are they focused on a little bit more than that? It remains unclear. But with those sort of open questions, I would think that it's likely not moot. But I, of course, welcome this Court's questions for my friends on the other side. All right. Thank you. So you haven't reserved — the other side hadn't reserved rebuttal, but we'll give you a moment to just address what's come up now. Thank you. Your Honors, I'd just like to briefly address the point that was made about the availability of dialysis in Jamaica. We have no assurances from the government that these appointments have actually been scheduled. We have not received any proof. We have emailed with the Government Council to ask for proof that Mr. Fulton has appointments scheduled, and we have not received that proof. The government's obligation — So if you could just — so if you could just — Is there any additional thing beyond what's stated in the declaration that you're seeking? Is it scheduled appointments? Or what's the — what is your — yes, what are you seeking beyond what's in the declaration? Yes, Your Honor, we're seeking confirmation of scheduled appointments for three times a week, which is the dialysis treatment he currently receives, and the government's confirmation that they will pay for those appointments. What happened to the flexible constitution? It's sounding like now you're really relying pretty heavily on the performance standards because you're saying it's got to be 30 days of three times a week, et cetera. That's not very flexible. The three times a week, Your Honor, is just the treatment that he currently receives. We are not saying that. His doctor says that he currently receives treatment three times a week, and that's a medical opinion that the district court can decide on the facts. Yes, but you're saying — the question is what does the law require to happen here? What does — what obligations does the constitution or some other source of authority place on the government? Also, like, nobody who represents Mr. Fulton has ever picked up a phone and tried to talk to the people at the Jamaican embassy that the government has spoken to? Your Honor, we have spoken with the embassy, and we have not received confirmation of scheduled appointments. We have also tried to arrange for medication, but, again, it is the government's obligation to do so under both the performance-based national detention standards and the constitution. And there is a flexible standard for what timeline it will take in order — excuse me, for how long the government needs to provide this interim supply, and that standard was flexible on purpose. It could be that it takes him, you know, for example, one week to get a new provider for dialysis, but it could be slightly longer. But the claim here is that we need proof that the government has scheduled appointments for Mr. Fulton in Jamaica, and we have not received that proof as of right now. Okay. All right. All right. Thank you. Thank you both. We'll take the motion under advisement.